Filed 9/23/20  In re M.P. CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re M.P. et al., Persons Coming Under the Juvenile Court Law. | B302090 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>Me.P.,<br><br>Defendant and Appellant. | Los Angeles County Super. Ct. No. 19LJJP00694A, 19LJJP00694B |

APPEAL from an order of the Superior Court of Los Angeles County.  Michael C. Kelley, Judge.  Affirmed.

Konrad S. Lee, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, County Counsel, Kristine P. Miles, Assistant County Counsel, and Peter Ferrera, Principal Deputy County Counsel, for Plaintiff and Respondent.

The juvenile court assumed jurisdiction over mother's 13- and seven-year-old daughters upon a finding that mother's recurring abuse of Oxycontin posed a substantial risk to the children's physical health and safety. (Welf. & Inst. Code, § 300, subd. (b).)[1] The court did not declare the children dependents. Instead, it ordered informal supervision and family maintenance services under section 360, subdivision (b). Mother contends the evidence is insufficient to support the jurisdictional finding. We disagree. While mother had made meaningful progress toward overcoming her addiction, the evidence showed she had relapsed in the past after making similar progress, and the possibility of another relapse posed a continuing risk of harm to her children that warranted informal supervision. We affirm.

**FACTS AND PROCEDURAL BACKGROUND**

Consistent with our standard of review, we state the facts in the light most favorable to the juvenile court's findings, resolving all conflicts and drawing all reasonable inferences to uphold the court's order, if possible. (*In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1216 (*Christopher R.*).)

The children, 13-year-old M.P. and seven-year-old V.P., live with mother, their maternal aunt, and their maternal grandparents. Mother and father are divorced. Mother has primary custody of the children and father has visitation two days a week for a few hours and every other weekend.

In July 2019, the Los Angeles County Department of Children and Family Services (Department) received a referral alleging M.P. had walked in on mother " 'free basing' " drugs in a bedroom that mother shared with her younger daughter, V.P.

---

[1] Statutory references are to the Welfare and Institutions Code.

M.P. described walking into the room and seeing mother smoking something off a piece of foil with a pen and a lighter. She had smelled the distinctive scent for about a year and knew it was drugs, but she did not know what type of drug it was. She told her grandmother and aunt. Her grandmother told M.P. she would "handle it" and instructed M.P. "not to tell anyone."

M.P. also described an incident when mother had been intoxicated and fell down the stairs while caring for V.P. The 13-year-old explained, "My mom fell down the stairs late at night, in the dark. It was normal for her to be smoking as the smell had been around for a while. [V.P.] was by her side [when] mom fell down the stairs." Mother told father she was just drunk at the time. She acknowledged V.P. "freaked out" and was "hysterically crying."

Mother admitted using Oxycontin for about five years. A coworker supplied her with the drug. At her worst she was using "about four to five pills" and "smoking them." She said she used "foil and a pen" and admitted, "I would use everywhere; in my car, anywhere." She acknowledged she became more aggressive and isolated herself when she used drugs. She told the social worker, "I'm sure I placed [the children] at risk when I was using." She said having M.P. "catch" her was "an eye opener."

In March 2019, mother told the maternal grandparents about her drug problem and attempted a "home detox[ ]." She relapsed after 60 days of sobriety. Although she was isolating herself again, the maternal grandparents "never addressed or asked anything" about her relapse. She went back to using two to three pills a day. Eventually, in May 2019, her parents questioned her about her sobriety. She broke down and told them she could not overcome her addiction on her own.

On June 10, 2019, mother entered an inpatient treatment program. She completed "28 to 30 days" of inpatient treatment, followed by two weeks of "transitional living." She continued to attend day treatment sessions and to test for drugs through the program. She said she might only attend her outpatient program for another two weeks depending on her insurance coverage.

The maternal grandmother defended her decision not to inform father of mother's addiction. She said she and the grandfather anticipated the Department would become involved if father knew what had happened. She maintained the children were not in danger, but also acknowledged mother was "driving around with the girls and she [was] higher than a kite."

On October 14, 2019, mother's drug treatment program provided a letter confirming her participation. The program reported mother "presents in the preparation stage of change with regards to the disease concept and readiness to change her behavior." All of mother's random drug tests were clean.

On October 23, 2019, the juvenile court held a combined jurisdiction and disposition hearing. Mother testified. She admitted she had struggled with Oxycontin, but maintained she had learned to cope with the "triggers" that led to her drug abuse. She said she was committed to completing her programs without a court order, but acknowledged her insurance might not cover the full amount of her treatment. If she lost insurance coverage, she planned to continue attending support meetings and to receive counseling from her sponsor. Her parents had been attending meetings with her.

Mother said her drug use "became an everyday addiction" during the past year. A friend at work had introduced her to Oxycontin. She felt depressed during her divorce and had been

4

looking for something to "numb the pain." She said tensions with father remained high and there had been recent disputes over visitation. She planned to return to work in the coming month and did not know whether the friend who supplied her with Oxycontin was still there.

Mother admitted there were times she cared for the children while under the influence, and she acknowledged her drug abuse impacted her children emotionally, as she was not "there as much as [she] thought [she] was" when she was using. She also acknowledged the drug was more powerful and dangerous when she smoked it.

Mother's counsel asked the juvenile court to dismiss the petition. She argued mother did not need the Department's supervision because mother had voluntarily entered treatment. The children's counsel argued the court should sustain the drug abuse allegation, emphasizing mother's treatment program reported she was only in the "preparation stage" of recovery. The Department joined the children's counsel, adding that the family strife that triggered mother's drug use was ongoing.

The juvenile court sustained the petition under section 300, subdivision (b), finding mother's history of substance abuse posed a substantial risk of harm to the children. With respect to disposition, the court declined to adjudicate the children dependents. Instead it ordered the family to receive six months of Department supervised family maintenance services under section 360, subdivision (b).

Mother filed a timely notice of appeal from the disposition order.

# DISCUSSION

Under section 360, subdivision (b), "[i]f the court finds that the child is a person described by Section 300, it may, without adjudicating the child a dependent child of the court, order that services be provided to keep the family together and place the child and the child's parent or guardian under the supervision of the social worker" for six to 12 months. If the court orders a program of informal supervision, " 'it does not dismiss the dependency petition or otherwise set it aside. The true finding of jurisdiction remains. It is only the dispositional alternative of declaring the child a dependent that is not made.' " (*In re Adam D.* (2010) 183 Cal.App.4th 1250, 1260 (*Adam D.*), quoting Seiser & Kumli, Cal. Juvenile Courts Practice and Procedure (2009) § 2.124[2], pp. 2-283 to 2-284.) An order for informal supervision under section 360, subdivision (b) is an appealable disposition order. (*Adam D.,* at p. 1261.)

The juvenile court asserted jurisdiction under section 300, subdivision (b). The statute authorizes jurisdiction upon a finding, by a preponderance of the evidence, that a "child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent . . . to provide regular care for the child due to the parent's . . . substance abuse."

"Although section 300 generally requires proof the child is subject to the defined risk of harm at the time of the jurisdiction hearing [citations], the court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child. [Citation.] The court may consider past events in deciding whether a child presently needs the court's protection. [Citation.] A parent's ' "[p]ast conduct

6

may be probative of current conditions" if there is reason to believe that the conduct will continue.' " (*Christopher R., supra,* 225 Cal.App.4th at pp. 1215–1216.) An unresolved drug problem compromises a parent's "ability to care for [her] child, thus justifying the assumption of jurisdiction." (*In re R.R.* (2010) 187 Cal.App.4th 1264, 1284.)

In addition, the Legislature has declared "[t]he provision of a home environment free from the negative effects of substance abuse is a necessary condition for the safety, protection and physical and emotional well-being of the child. Successful participation in a treatment program for substance abuse may be considered in evaluating the home environment." (§ 300.2; *Christopher R., supra,* 225 Cal.App.4th at p. 1216.)

We review the juvenile court's jurisdictional findings for substantial evidence. (*Christopher R., supra,* 225 Cal.App.4th at p. 1216.) "Under this standard '[w]e review the record to determine whether there is any substantial evidence to support the juvenile court's conclusions, and we resolve all conflicts and make all reasonable inferences from the evidence to uphold the court's orders, if possible.' " (*Ibid.*)

There was substantial evidence that mother's drug abuse placed the children at risk of serious physical harm. Mother admitted her Oxycontin use had become "an everyday addiction" during the past year. She was using "about four to five pills" a day and "smoking them." She used "everywhere," including in the car and in the home. The maternal grandmother reported mother had been "driving around with the girls and she [was] higher than a kite." Before catching mother freebasing Oxycontin, 13-year-old M.P. had smelled the distinctive scent of drugs around the home for about a year. When asked about

7

the effect her drug use had on her daughters, mother admitted, "I'm sure I placed [the children] at risk when I was using."

Mother contends this evidence should be disregarded. She maintains her drug use had been "resolved to such an extent" by the jurisdiction hearing that it "posed no risk of substantial or imminent harm to the children." She emphasizes she voluntarily confronted her abuse. She had completed a residential drug program and had tested negative for Oxycontin for four months. She continued to participate in aftercare services and was attending support meetings with her parents and a sponsor. She also lived with the maternal grandparents who, mother maintains, would "protect the children from any potential future problems, should [she] lapse." In view of her voluntary efforts and stable family circumstances, mother argues it was "highly speculative" for the court to find her past drug abuse established a current risk of harm to the children. (See *In re M.W.* (2015) 238 Cal.App.4th 1444, 1454 [more than mere speculation is required to support a finding].)

There is no doubt that mother had made meaningful progress toward overcoming her addiction, but we do not agree this progress rendered the court's jurisdictional finding highly speculative. On the contrary, the evidence supported a reasonable inference that mother might relapse into drug abuse, and that the grandparents' support alone was insufficient to ensure the children's safety. Our cases have consistently recognized the threat of relapse is sufficient to find a substantial risk of harm, even after lengthy periods of sobriety. (See *In re J.C.* (2014) 233 Cal.App.4th 1, 6–7 (*J.C.*) [no error in removing infant from the father's custody where, notwithstanding the father's plan to live with his parents and his seven months

8

of sobriety, evidence showed he had "years-long struggles with drug abuse" and he was at "risk of relapsing"]; *In re Amber M.* (2002) 103 Cal.App.4th 681, 686–687 [evidence supported denial of custody, notwithstanding 372 days of sobriety, where the mother had relapsed twice during the course of case, including once after more than 300 days of sobriety].)

The record shows that a few months before mother entered an inpatient treatment program she had attempted to "home detox" under the maternal grandparents' supervision. After 60 days of sobriety, mother was back to using two to three pills a day. For two to three weeks she exhibited the familiar signs of Oxycontin use—she became withdrawn and isolated herself from the family, but the grandparents "never addressed or asked anything" about her apparent relapse. The maternal grandmother suggested they kept silent about mother's drug abuse because they anticipated social services would get involved if word got out. Mother said her contentious interactions with father had been a trigger for her drug use, and she acknowledged their relationship remained tense. A friend at work had introduced mother to Oxycontin, and mother was unsure whether that friend would still be there when she returned to work in the coming weeks. And, critically, although mother had been sober for over four months at the time of the jurisdiction hearing, she had been using Oxycontin for five years and her drug treatment program reported she "present[ed] in the preparation stage of change with regards to the disease concept and readiness to change her behavior." From this evidence the juvenile court reasonably inferred mother's recovery remained tenuous and the danger of relapse persisted. Based on mother's history of drug abuse, including her admission that she cared for the girls while

under the influence, the court reasonably found the potential for relapse posed a substantial risk of harm to her daughters. (See *J.C., supra,* 233 Cal.App.4th at pp. 6–7 [removal order supported where, although father had good attendance and clean tests in treatment program, his conduct before entering program, including drug use leading to removal of his two older children, suggested he was "prone to relapses"]; see also *In re Cliffton B.* (2000) 81 Cal.App.4th 415, 424 ["200 days was not enough to reassure the juvenile court that the most recent relapse would be [the father's] last"]; *In re Kimberly F.* (1997) 56 Cal.App.4th 519, 531, fn. 9 ["It is the nature of addiction that one must be 'clean' for a much longer period than 120 days to show real reform."].)

Substantial evidence supported the jurisdictional finding. The juvenile court did not err in asserting jurisdiction and ordering informal supervision under section 360, subdivision (b). (See *Adam D., supra,* 183 Cal.App.4th at p. 1262.)

**DISPOSITION**

The order is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


EGERTON, J.

We concur:


LAVIN, Acting P. J.                    DHANIDINA, J.


10